SUPERIOR COURT 
 
 JAMES CARVER vs. CAROL A. MICl[1] and STEPHEN KENNEDY[2]

 
 Docket:
 2177CV00105 / 2177CV00272
 
 
 Dates:
 December 30, 2021
 
 
 Present:
 Jeffrey T. Karp Associate Justice, Superior Court
 
 
 County:
 ESSEX, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS (Paper No. 23)
 
 

             These two related matters are actions for certiorari review pursuant to G.L. c. 249, § 4, of the denial of the petition of plaintiff James Carver ("Carver") by the Commissioner of the Department of Corrections ("DOC"), defendant Carol A. Mici, for medical parole under G.L. c. 127, § 119A ("medical parole statute" or "Statute"). Carver has requested that the Court enter judgment on the pleadings on his behalf, set aside the Commissioner's denial of medical parole, and enter an order granting him medical parole.
            On December 17, 2021, the Court conducted a hearing on Plaintiff's Motion For Judgment On The Pleadings (Paper No. 23 in Case No. 2177CV00105) ("Motion").
 
-------------------------------------
 
            [1] In her capacity as Commissioner of the Massachusetts Department of Corrections        ("Commissioner").
 
[2] In his capacity as Superintendent of the Old Colony Correctional Center ("Superintendent").
 
                                                            Page 1 of 16
 
            After careful and thorough review of the parties' memoranda, pleadings, the Commissioner's written decisions,[3] and the administrative record, the Motion is DENIED.
PROCEDURAL HISTORY
            On September 30, 2020, Carver submitted a petition for medical parole to the Superintendent of the Old Colony Correctional Center ("OCCC"), defendant Stephen Kennedy, as required by the Statute. See G.L. c. 127, § 119A(c)(1) ("The superintendent of a correctional facility shall consider a prisoner for medical parole upon a written petition by the prisoner.... The superintendent shall review the petition and develop a recommendation as to the release of the prisoner.").
            In a written decision dated October 21, 2020, the Superintendent recommended that the Commissioner deny Carver's petition. (Part I of the administrative record, pp. 14 - 17) ("I, 14 - 17").[4] Thereafter, the Commissioner authored three decisions that are at issue here.
            In a decision dated December 4, 2020, the Commissioner denied Carver's petition for medical parole. (I, 1 - 3). Thereafter, Carver submitted updated medical information and requested the Commissioner to reconsider the denial of the petition. In a decision dated March 1, 2021, the Commissioner denied Carver's request for reconsideration. (II, 1 - 2). Those two decisions are the subject of Case No. 2177CV00105, which Carver filed in January 2021.
 
-------------------------------------
 
[3] As is discussed below, the Commissioner authored three decisions that are at issue here that are dated December 4, 2020; March 1, 2021; and, August 17, 2021.
 
[4] The administrative record has been filed with the court in four parts, and the pages in each part are identified thereon as "A.R [page number]." The Court will refer to the administrative record by citing the applicable part and page numbers, for e.g., "Ill, 21 - 24."
 
                                                            Page 2 of 16
 
            On July 9, 2021, the Court (Howe, J.), remanded the decision denying medical parole to the Commissioner, and ordered her to review and consider a video recording depicting an alleged incident at the OCCC in June 2020 involving Carver that the Commissioner referenced in the decisions. (See Memorandum of Decision, Paper No. 19 in Case No. 2177CV00105).
            After the Commissioner reviewed the video recording, she once again denied the petition in a decision dated August 17, 2021. (Ill, 1 - 3). That decision is the subject of Case No. 2177CV00272.[5]
BACKGROUND
            The following evidence is taken from the administrative record. [6]
            Carver was 57 years-old at the time of the Commissioner's final decision denying his petition for medical parole. At that time, he suffered from myriad medical conditions including, inter alia, chronic dizziness, vertigo, seizures, and tremors resulting from epilepsy and brain surgery Carver had years ago; angina; coronary artery disease; atrial fibrillation; hypertension; high cholesterol; and, depression. He was diagnosed with melanoma on an unspecified date and prostate cancer in 2015, but refused treatment for the latter condition. [7]
 
-------------------------------------
 
[5] At bottom, the three decisions denied Carver's petition for medical parole for the same reasons. The Court has closely and thoroughly reviewed the three decisions, the last two of which are somewhat cumulative of the two previous decisions. The Court will refer herein to the three decisions collectively as "the Decisions."
 
            [6] Additional relevant facts are discussed, infra, in the Court's Discussion section.
 
[7] During a visit with his doctor at the OCCC, John Strauss, M.D., when discussing the issue of treatment for prostate cancer, Carver reported, "I feel fine, I have no major issues, just swelling."
 
                                                            Page 3 of 16
 
            Carver uses a wheelchair for mobility due to these conditions. However, he is able to independently transfer himself from and to the wheelchair, although he apparently injured himself on one such occasion. Carver is able to stand with support, and independently use the bathroom, shower, dress, and eat.
            In July 2020, Carver attempted to hang himself. This was a "premeditated" suicide attempt.
            On June 21, 2020, while on a mental health watch while at the OCCC medical unit, Carver was involved in an incident when several corrections officers attempted to remove the sheets and blanket from the bed at the request of the medical staff. During the incident, Carver threw his watch at an officer, attempted "an awkward open hand punch" to the officer's chest, twisted the officer's wrist, and wrapped both of his legs around one of the officer's legs.[8]
DISCUSSION
            I. STATUTORY  FRAMEWORK
                        A. The Certiorari Framework
 
            "A prisoner ... aggrieved by a decision denying or granting medical parole made under [the medical parole statute] may petition for relief pursuant to [the certiorari statute at G.L. c. 249, § 4]." G.L. c. 127, § 119A(g).
            "[T]he animating principle behind certiorari review ... is 'a limited procedure reserved for correction of substantial errors of law apparent on the record created before a judicial or quasi-judicial tribunal."' Revere v. Massachusetts Gaming Comm'n, 476 Mass. 591, 606 (2017) (citations omitted). "The function of a writ of certiorari is not
 
-------------------------------------
 
[8] The record contains reports authored by officers that were present for the incident and a video recording of the incident, which the Court has viewed.
 
                                                            Page 4 of 16
 
to reverse or revise findings of fact but to correct errors of law committed by a judicial or quasi judicial tribunal where such errors appear upon the face of the return and are so substantial and material that, if allowed to stand, they will result in manifest injustice to a petitioner who is without any other available remedy." Tracht v. County Comm'rs of Worcester, 318 Mass. 681, 686 (1945) (citations omitted); see also Lewis v. Committee
 
for Pub. Counsel Servs., 50 Mass. App. Ct. 319, 328 (2000) (same) (quoting Tracht). "Generally, the standard of review for a certiorari action is calibrated to the nature of the action for which review is sought." Revere, 476 Mass. at 604 (citation omitted). "'Ordinarily, where the action being reviewed is a decision made in an adjudicatory proceeding where evidence is presented and due process protections are afforded, a court applies the 'substantial evidence' standard."' ]Q. (citation omitted). On the other hand, "'where the decision under review was not made in an adjudicatory proceeding' [like the Decision here,] but rather entails matters committed to or implicating a board's exercise of administrative discretion, the court applies the 'arbitrary or capricious' standard." ]Q. at 605 (citation and quotation omitted) (original emphasis); see also Doucette v. Massachusetts Parole Bd, 86 Mass. App. Ct. 531,541 (2014) (applying arbitrary or capricious standard in action for certiorari challenging Parole Board's revocation of parole).
            "Th[e arbitrary or capricious} standard requires only that there be a rational basis for the decision." Mederi, Inc. v. Salem, 488 Mass. 60, 67 (2021) (citation omitted). "A decision is arbitrary or capricious such that it constitutes an abuse of discretion where it 'lacks any rational explanation that reasonable persons might support."' Frawley v. Police Comm'r of Cambridge, 473 Mass. 716, 729 (2016) (citation omitted). Stated
 
                                                            Page 5 of 16
 
differently, "[a]rbitrary and capricious action is that which is taken 'without consideration and in disregard of facts and circumstances."' Hercules Chem. Co. v. Department of Envtl. Protection, 76 Mass. App. Ct. 639, 643 (2010) (citation omitted).
            B. The Medical Parole Framework
            "The medical parole statute was enacted in 2018 to allow for the release of prisoners who are terminally ill or permanently incapacitated." Harmon v. Commissioner of Correction, 487 Mass. 470, 472 (2021). In enacting the Statute, the Legislature had certain "trends in mind -the aging prison population, the rising cost of health care, and the fact that elderly and infirm prisoners are 'considered among the least likely to re-offend when released."' Buckman v. Commissioner of Correction, 484 Mass. 14, 20 (2020) (footnote omitted). "Although the focus was on cost savings, there was also a human element to the legislation." id.. at 22.
            "The process prescribed by the statute begins when a petition for release on 
medical parole is submitted by or on behalf of a prisoner to the superintendent of the prison in which the individual is incarcerated." jg_. (citation omitted). "Within twenty-one days of receiving a petition, the superintendent 'shall review the petition and develop a recommendation as to the release of the prisoner.' ... The superintendent then 'shall' transmit the petition and a recommendation on whether it should be granted to the [C]ommissioner, along with a medical parole plan, a medical diagnosis, and an assessment of the risk of violence by the prisoner if he or she were to be released to the community." id. (citations omitted).
 
                                                            Page 6 of 16
 
            Generally speaking, "[u]nder G.L. c. 127, § 119A, medical release is limited to two narrow categories of prisoners: those with 'permanent incapacitation' ... and those with a 'terminal illness,' [as those terms are defined by the Statute]." Buckman, 484 Mass. at 17 (citation omitted).
            Here, Carver conceded at the hearing that he does not qualify under the Statute by suffering from a "terminal illness." Rather, he argues that he qualifies because he suffers from "permanent incapacitation." "'Permanent incapacitation' [is defined as] a physical or cognitive incapacitation that appears irreversible, as determined by a licensed physician, and that is so debilitating that the prisoner does not pose a public safety risk." G.L. c. 127, § 119A(a).
            A prisoner must be granted medical parole "[i]f the [C]ommissioner determines that [the] prisoner is ... permanently incapacitated such that if the prisoner is released the prisoner will live and remain at liberty without violating the law and that the release will not be incompatible with the welfare of society." G.L. c. 127, § 119A(e).
            Thus, as it applies in this case, "in deciding whether to allow medical release, the [S]tatute requires the [C]ommissioner to make three determinations: (1) is [Carver] .. 'permanently incapacitated'? (2) if released, will [Carver] live and remain at liberty 'without violating the law' and (3) is [his] release 'incompatible with the welfare of society'?" Buckman, 484 Mass. at 19 (citation omitted). "If the [C]ommissioner determines that the answer to the first two questions is 'yes,' and the answer to the third is 'no,' '[Carver] shall be released on medical parole."' id.. (citation omitted).
            As is discussed below, in applying the above standards, the Court concludes the Decisions were neither arbitrary nor capricious.
 
                                                            Page 7 of 16
 
II. THE COMMISSIONER'S DECISION TO DENY MEDICAL PAROLE WAS NOT ARBITRARY OR CAPRICIOUS
A. Carver Does Not Qualify For Medical Parole Because He Is Not "Permanently Incapacitated"
            The first issue that must be addressed by the Court is whether the Commissioner acted arbitrarily or capriciously in finding that the medical evidence failed to show that Carver suffers from "permanent incapacitation" under the Statute, i.e., that he suffers from "a physical or cognitive incapacitation that appears irreversible, as determined by a licensed physician, and that is so debilitating that the prisoner does not pose a public safety risk." G.L. c. 127, § 119A(a) (emphasis added). In sum, the statutory definition sets forth two prongs or requirements that must be shown to determine that a prisoner suffers from "permanent incapacitation": (1) a finding by a physician that the prisoner suffers from incapacitation that "appears irreversible"; and, (2) evidence that the incapacitation is so debilitating that it results in the prisoner not being a safety risk.
            As an initial matter, the Court will address whether the Statute requires a licensed physician to expressly opine that the prisoner suffers from "incapacitation that appears irreversible." id. The plain reading of the Statute demonstrates that such an express opinion by a licensed physician is required.9 Nevertheless, at the hearing, Carver took the position that an express opinion is not required under the Statute and the Commissioner's counsel took no position.
            Moreover, the Decisions are unclear regarding this issue and, in fact, the Commissioner appears to conflate the two prongs of the statutory definition of "permanent incapacitation" in the Decisions. For example, in her decisions of December
 
-------------------------------------
 
[9] '"[W]here the language of a statute is plain and unambiguous, it is conclusive as to the legislative intent."' Buckman, 484 Mass. at 25 (citation omitted).
 
                                                            Page 8 of 16
 
1, 2020, and March 1, 2020, after describing Dr. John Strauss's findings regarding Carver's medical conditions, the Commissioner observed that Dr. Strauss "does not opine that Mr. Carver is currently ...'permanently incapacitated' within the meaning of the medical parole statute," (1,2; II, 2); thus, implying that the absence of an explicit opinion is fatal. Nevertheless, in both decisions, immediately after the aforementioned quoted language, the Commissioner stated, "Accordingly, I do not find that Mr. Carver's current medical condition is so debilitating that (he does] not pose a public safety risk." (Id.). Thus, it appears in these two decisions the Commissioner ruled that the absence of such an express opinion of the appearance of irreversibility due to incapacitation by Dr. Strauss somehow caused her to rule that the second prong of the statutory definition of "permanent incapacitation" was not shown.[10]
            At the hearing, Carver argued that the Statute does not require an express opinion by a doctor of "permanent incapacitation." Instead, he argues that a reasonable inference of the appearance of irreversibility of his physical and mental incapacitation may be gleaned from the medical evidence in the record. More specifically, Carver points to the following entries in his medical records made by Dr. Strauss as evidence that he suffers from incapacitation "that appears irreversible": (a) on October 9, 2020, Carver had "multiple risk factors for mortality and morbidity[, and] debilitating medical conditions with high risk for permanent incapacitation, (I, 23); (b) on January 25, 2021,
 
-------------------------------------
 
[10] In the Commissioner's decision on remand of August 17, 2021, in which the Commissioner once again considered updated medical evidence, she did not address the absence of an opinion from a physician of "permanent incapacitation" under the Statute. Instead, the Commissioner stated that according to the new medical evidence, "Mr. Carver fails to meet the criteria for permanent incapacitation, as he does not have a physical or cognitive incapacitation that is so debilitating that he does not pose a public safety risk." (Ill, 2 - 3). Thus, once again, she did not separately address the first prong.
 
                                                            Page 9 of 16
 
Carver continued to have "multiple risk factors for mortality and morbidity[,] and [] debilitating medical conditions with permanent mobility and other functional incapacitation," (II, 7); (c) on January 25, 2021, Carver's "[l]ife expectancy [the] next 18 months [was] expected[,] but at significant risk," (Id.); and, (d) on July 29, 2021, Carver had "multiple chronic medical condition[s,] which require him to use a wheelchair for movement." (Ill, 9). Furthermore, Carver emphasizes that his "permanent incapacitation" is evidenced by his dependence on a wheelchair and a "companion" for mobility, his inability to stand without support, his need for assistance with feeding and dressing himself when experiencing tremors, and the fact that he injured himself when independently transferring himself from the toilet to the wheelchair on one occasion.
            In the Court's view, the record clearly establishes that Dr. Strauss has concluded Carver suffers from myriad significant, incapacitating, chronic medical conditions. Furthermore, leaving aside the Court's view that the Statute requires a doctor to expressly opine that Carver suffers from a physical incapacitation that "appears irreversible," the record does reflect that Dr. Strauss concluded that as of January 25, 2021, Carver had "permanent mobility and other functional incapacitation." (II, 7) (emphasis added). The record does not reflect what Dr. Strauss meant by "permanent" incapacitation; however, the definition of "permanent" is "lasting or continuing for a very long time or forever: not temporary or changing." https://www.merriam-webster.com/dictionary/permanent (last accessed December 28, 2021). Therefore, in the absence of clarity by the Commissioner in the Decisions and at the hearing regarding whether or not the evidence established the first prong of the statutory definition of "permanent incapacitation," a reasonable inference may be drawn from the
 
                                                            Page 10 of 16
 
record evidence that a physician has determined that Carver's physical incapacitation "appears irreversible" as required by the first prong of the statutory definition of "permanent incapacitation." See G.L. c. 127, § 119(a).
            The issue that remains for the Court's determination regarding whether the Commissioner acted arbitrarily or capriciously in finding that Carver did not meet the definition of "permanent incapacitation" under the Statute pertains to the second prong of the statutory definition: the propriety of the Commissioner's finding that Carver's incapacitation is not "so debilitating that [he] does not pose a public safety risk." G.L. c. 127, § 119(a).
            In the (final) decision of August 17, 2021, on the issue of whether Carver's incapacitation is "so debilitating that [he] does not pose a public safety risk" (i.e., meets the second prong of the definition of "permanent incapacitation"), the Commissioner stated, inter alia, the following:
According to the July 29, 2021 medical evaluation, though Mr. Carver has a number of medical conditions, they are all stable. He requires a wheelchair for mobility, but only due to an unsteady gait and tremors, as opposed to physical weakness. He is able to independently perform a number of activities of daily living, including utilizing the bathroom and catheterizing himself, feeding himself, shower, and dressing himself. I will note that Mr. Carver is incarcerated due to an incident in which he set fire to a rooming house, resulting in the deaths of fifteen people within that building. In his current physical condition, Mr. Carver is certainly still capable of committing a similar crime.
(Ill, 3).
            These findings are neither arbitrary nor capricious, and are fully supported by the record evidence. Further, Carver's argument that the Commissioner abused her discretion in crediting written reports of the June 21, 2020, incident and "ignoring" the
 
                                                            Page 11 of 16
 
video recording (which, according to Carver, "obviously" shows that he did not act aggressively at all during the incident) is without merit. The reports were authored by officers with firsthand knowledge of the incident who were present during the incident. Further, although the video recording does not conclusively depict Carver striking an officer because the officers were between Carver and the camera, the video does show the officers acting in response to something Carver did to them, Carver physically struggling with the officers, and Carver wrapping his legs around one of the officers during the struggle.
            Furthermore, in light of Carver's current physical condition and his conduct during the June 2020 incident, it was not improper, as he argues, for the Commissioner to consider the facts of the horrific crime for which Carver is imprisoned when determining that he "is certainly still capable of committing a similar crime," (Ill, 3), i.e., the second factor of the definition of "permanent incapacitation." Fifteen innocent people died as a result of Carver striking a match to an accelerant at the rooming house while they slept. There is nothing about Carver's myriad medical conditions, dependence on a wheelchair for mobility, or any other record evidence that he can point to that supports the notion that the Commissioner's aforementioned finding "is arbitrary or capricious such that it constitutes an abuse of discretion where it 'lacks any rational explanation that reasonable persons might support."' Frawley, 473 Mass. at 729 (citation omitted).[11]
 
-------------------------------------
 
[11] The same analysis and reasoning precludes a determination that "if released, [Carver will] live and remain at liberty 'without violating the law,"' Buckman, 484 Mass. at 19 (citation omitted), one of the three determinations that the Commissioner must find to grant Carver medical parole. jg., but see Buckman, 484 Mass. at 19 n.9 ("Where the commissioner determines that the prisoner suffers from 'permanent incapacitation' ... the commissioner has already determined, based on the definition of those statutory terms, that 'the prisoner does not pose a public safety risk.' G. L c. 127, § 119A (a). Because we recognize the possibility that a prisoner who does not pose a public safety risk may nonetheless violate the law, we do not equate 'does not pose a public safety risk' with 'will live and remain at liberty without violating the law,' but instead note their close interrelationship.").
 
                                                            Page 12 of 16
 
III. THE SUPERINTENDENT'S FAILURE TO SUBMIT A MEDICAL PAROLE PLAN TO THE COMMISSIONER IS NOT GROUNDS TO VACATE THE COMMISSIONER'S DECISION
            "General Laws c. 127, § 119A(c)(1), requires that within twenty-one days of a petition for medical parole, a prison superintendent must submit a recommendation to the commissioner accompanied by a medical parole plan." Malloy v. Department of Corrections, 487 Mass. 482, 493 (2021). "The superintendent ... bears the burden of preparing or procuring '(i) [the] medical parole plan."' Buckman, 484 Mass. at 17 (citation omitted).
            "[T]he medical parole statute, prescribes a detailed procedure under which committed offenders who are terminally ill or permanently mentally or physically incapacitated may apply for release on parole." Malloy, 487 Mass. at 484.
            In Malloy, the SJC described the procedure as follows:
The process is initiated when a written petition for release on medical parole is submitted by or on behalf of a prisoner to the superintendent of the prison in which he or she is incarcerated.... Within twenty-one days of receiving the petition, the superintendent must create a medical parole plan for the prisoner's placement and treatment if released, obtain a written medical diagnosis and prognosis by a physician, and arrange an assessment of the risk to the community if the prisoner were to be released At the end of the twenty-one day period, the superintendent must transmit the petition to the commissioner, accompanied by a recommendation as to whether it should be granted and three supporting documents: a medical parole plan; a written diagnosis by a physician; and an assessment of the risk for violence that the prisoner poses to society.
Id. (citations and footnote omitted).
 
                                                            Page 13 of  16
 
            "The medical parole plan is the only one of the supporting documents that is defined in the statute." )Q. at 485 (citation omitted). The Statute defines and delineates the required contents of a medical parole plan ("MPP"), as follows:
"'Medical parole plan' [is] a comprehensive written medical and psychosocial care plan specific to a prisoner and including, but not limited to: (i) the proposed course of treatment; (ii) the proposed site for treatment and post-treatment care; (iii) documentation  that medical providers qualified to provide the medical services identified in the medical parole plan are prepared to provide  such  services; and (iv) the financial program  in place to cover the  cost of the plan for the duration of the  medical parole,  which shall include eligibility for enrollment in commercial insurance, Medicare or Medicaid or access to other adequate financial resources for the duration of the medical parole."
G.L. c. 127, § 119A(a).
            Here, there is little dispute that the Superintendent failed to prepare or procure an MPP and submit it to the Commissioner with his recommendation regarding whether Carver's petition should be granted.[12]
 
--------------------------------------
 
[12] The Commissioner points to a portion of Carver's petition for medical parole entitled "Medical Parole Plan" wherein Carver described his proposed release plan, (I, 19 - 20), and argues that it fulfills the Superintendent's statutory obligation to "procure" an MPP and submit it to the Commissioner. See e.g., Malloy, 487 Mass. at 488 (information proposed by the prisoner in the petition "appears to be the entirety of the medical parole plan submitted to the commissioner."). The Court disagrees because, inter alia, the information provided by Carver in his petition fails to satisfy the specific content requirements of an MPP required by the Statute. See e.g., G.L. c. 127, § 119A(a) (MPP must include "(i) the proposed course of treatment; (ii) the proposed site for treatment and post-treatment care; (iii) documentation that medical providers qualified to provide the medical services identified in the medical parole plan are prepared to provide such services . . .").
 
                                                            Page 14 of 16
 
            Carver argues in the Motion that this violation of the Statute and the Superintendent's purported failure to engage in a collaborative process to work together to prepare an MPP are grounds for the Court to reverse the Commissioner's denial of medical parole.[13] The Court disagrees. The Court does not condone the Superintendent's failure to comply with the Statute. However, as Carver conceded at the hearing, the information required to be set forth in an MPP would not have had any bearing on the Commissioner's determination that Carver fails to meet the criteria for medical parole because it is not relevant to a decision regarding whether Carver suffers from "permanent incapacitation" under the Statute.
CONCLUSION
            In sum, the Commissioner's finding that Carver does not suffer from "permanent incapacitation" under the Statute is supported by substantial evidence, and is absent arbitrariness, capriciousness, abuse of discretion, and error of law. Therefore, the Commissioner properly denied Carver's petition for medical parole and the Motion must
be DENIED .[14]
 
-------------------------------------
 
[13] "In effect, by enacting § 119A, the Legislature intended to trigger a collaborative process whereby the health care provider for the institution, reentry staff, and the prisoner (or his or her attorney or next of kin) work together to prepare a medical parole plan for the prisoner and obtain a written diagnosis by a licensed physician.... But the superintendent ultimately bears the burden of producing or procuring these documents arising from the collaborative process." Buckman, 484 Mass. at 29.
 
[14] Carver's argument in the Motion that his continued imprisonment violates his constitutional right to be free from cruel and unusual punishment (prohibited by the Eighth Amendment to the United States Constitution) and cruel or unusual punishment (prohibited by Art. 26 of the Massachusetts Declaration of Rights) fails because it is dependent on Carver qualifying for medical parole in the first instance. Moreover, his reliance on the case of Torres v. Comm'r of Corr., 427 Mass. 611, 613 - 614 (1998), is misplaced as the facts and procedural posture of that case are disanalogous to this case.
 
                                                            Page 15 of 16
 
ORDER
            For the above reasons, it is HEREBY ORDERED that Plaintiff's Motion For Judgment On The Pleadings (Paper No. 23) is DENIED, the Commissioner's denial of Carver's petition for medical parole is AFFIRMED, and Final Judgment SHALL ENTER accordingly.
 
/s/Jeffrey T. Karp Associate Justice, Superior Court
 
December 30, 2021
 
                                                            Page 16 of 16